# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KENNETH E. SMITH (K-54173), ) | |
| ) | |
| Plaintiff, ) | |
| ) | 15 C 3730 |
| v. ) | |
| ) | Judge Gary Feinerman |
| WEXFORD HEALTH SOURCES, INC., DR. ) | |
| SALEH OBAISI, and TARRY WILLIAMS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

In this *pro se* 42 U.S.C. § 1983 suit, Kenneth E. Smith, an Illinois prisoner, alleges that Stateville Correctional Center Warden Tarry Williams and Dr. Saleh Obaisi, Stateville's medical director, were deliberately indifferent to his knee pain, and also that Dr. Obaisi's employer, Wexford Health Sources, Inc., had a policy of sacrificing patient care in favor of saving money. Doc. 29. (Smith voluntarily dismissed a claim against another defendant regarding his request for a lower bunk permit. Docs. 45, 59.) Defendants have moved for summary judgment. Docs. 74, 80. Smith did not respond, despite having been given ample opportunity to do so. Docs. 86, 91. Defendants' motions are granted.

## Background

Consistent with the local rules, Defendants filed Local Rule 56.1(a)(3) statements of undisputed facts with their summary judgment motions. Docs. 76, 81. The relevant factual assertions in the Local Rule 56.1(a)(3) statements cite evidentiary material in the record and are supported by the cited material. *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the

affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."). Also consistent with the local rules, Defendants served Smith with Local Rule 56.2 Notices, which explain what Local Rule 56.1 requires of a *pro se* litigant opposing summary judgment. Docs. 78, 83. Miller did not file a response brief, Local Rule 56.1(b)(3)(B) responses to the Local Rule 56.1(a)(3) statements, or a Local Rule 56.1(b)(3)(C) statement of additional facts.

"[A] district court is entitled to decide [a summary judgment] motion based on the factual record outlined in the [Local Rule 56.1] statements." *Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (third alteration in original), *overruled on other grounds by Ortiz v. Werner Enters.*, 834 F.3d 760, 764 (7th Cir. 2016) (citation and internal quotation marks omitted); *see also Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."); *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009) ("We have repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions."); *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("We have … repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1."). Smith's *pro se* status does not excuse him from following Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) ("Though courts are solicitous of pro se litigants, they

may nonetheless require strict compliance with local rules."); *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's discretion, even though Wilson is a pro se litigant.") (citation omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure.").

Accordingly, the court will accept as true the factual assertions set forth in Defendants' Local Rule 56.1(a)(3) statements, and will view the facts and inferences therefrom in the light most favorable to Smith. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607, 607 (7th Cir. 2017) ("The district court treated most of the [defendant's] factual submissions as unopposed, because [the plaintiff] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation."); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009) ("In accordance with [Local Rule 56.1(b)(3)(C)], the district court justifiably deemed the factual assertions in BP's Rule 56.1(a) Statement in support of its motion for summary judgment admitted because Rao did not respond to the statement."). That said, the court is mindful that "a nonmovant's … failure to comply with Local Rule 56.1 … does not … automatically result in judgment for the movant. The ultimate burden of persuasion remains with [the movants] to show that [they are] entitled to judgment as a matter of law." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (citations omitted). The court thus will recite the facts in Defendants' Local Rule 56.1(a)(3) statements, and then determine whether, on those facts, Defendants are entitled to summary judgment.

At all relevant times, Smith was incarcerated in Stateville Correctional Center, where Dr. Obaisi was the onsite medical director. Doc. 76 at ¶¶ 3-5; Doc. 81 at ¶ 1. Dr. Obaisi, who specializes in internal medicine, is employed by Wexford, the contractual provider of specified medical clinical services to Illinois prisons. Doc. 76 at ¶¶ 4-5. Williams was warden of Stateville from April 1, 2014, through July 12, 2015. Doc. 81 at ¶ 2.

Multiple medical and IDOC personnel are involved in patient care and the scheduling of examinations. Doc. 76 at ¶¶ 9-10. Written requests for medical treatment are reviewed by IDOC correctional medical technicians or administrative personnel. *Id*. at ¶ 10. Generally, triage and initial medical evaluations of inmates are made by physician's assistants, registered nurses, licensed practice nurses, and correctional medical technicians, who can refer patients for further intervention by other medical providers based upon their observations. *Id*. at ¶¶ 11, 14, 16. When an inmate complains of pain, a medical provider will determine a course of action based upon the reported pain, along with objective observations such as swelling, redness, deformity, or warmth at the site, or issues with range of motion or gait. *Id*. at ¶ 22. Dr. Obaisi does not schedule his own appointments or follow-ups, but relies upon other staff members to do so. *Id*. at ¶ 10. Institutional lockdowns instituted by prison staff may restrict inmate medical care. *Id*. at ¶ 12.

Smith first experienced knee pain on or about December 11, 2013. *Id*. at ¶ 27; Doc. 81 at ¶ 10. Over the next two days, he separately told two medical staffers that his knee hurt. Doc. 76 at ¶¶ 27-28. Medical records indicate that on January 7, 2014, Smith complained to a correctional medical technician of knee pain and was scheduled to see a nurse on January 13, 2014. *Id*. at ¶ 29; Doc. 81 at ¶¶ 11-12. Smith reported intermittent pain in his left knee for a month; the nurse observed no swelling and ordered ibuprofen for pain, an x-ray of the knee, and a two-week follow-

4

up appointment. Doc. 76 at ¶ 29; Doc. 81 at ¶ 13. Smith's knee was x-rayed that day, and Dr. Obaisi evaluated the film the following day and determined that it was negative for fracture. Doc. 76 at ¶¶ 29-30; Doc. 81 at ¶ 14.

On January 27, 2014, Smith saw a nurse for a scheduled follow-up and reported severe pain on the inside of his knee while walking. Doc. 76 at ¶ 31; Doc. 81 at ¶ 15. The nurse documented crepitus (a crackling sound) but no swelling, edema, eurhythmia, or bruising. Doc. 76 at ¶ 31. She informed Smith that the x-ray was negative for fracture, noted that his "gait" was "steady" and that he did not appear to be in acute distress, Doc. 84 at 3, and prescribed an analgesic balm and ibuprofen, Doc. 76 at ¶ 31; Doc. 81 at ¶ 16. On February 7, 2014, at an asthma clinic visit during which no complaint of knee pain was documented, Smith was issued a six-month low gallery permit. Doc. 76 at ¶ 32; Doc. 81 at ¶ 18.

On February 10, 2014, Smith saw a nurse for his knee pain; she found no ecchymosis, redness, bruising, swelling, or tenderness. Doc. 76 at ¶ 33; Doc. 81 at ¶ 19. Smith reported taking his pain medication off and on as needed. Doc. 76 at ¶ 33, Doc. 76-1 at 34 (Tr. 104:19-21.) Smith's range of motion in the knee was "within normal limits," and the nurse prescribed hot and cold packs and told him to follow up if the pain worsened. Doc. 76 at ¶ 33.

A physician's assistant ("P.A.") prescribed Smith Tylenol 325 mg on February 18, 2014. *Id*. at ¶ 34; Doc. 81 at ¶ 17. A week later, the P.A. again examined Smith for his knee pain, which Smith said had worsened. Doc. 76 at ¶ 34; Doc. 81 at ¶ 21. The P.A. found no deformities and that Smith had full range of motion "and negative anterior and posterior drawer test," Doc. 76 at ¶ 34, indicating no injury to the cruciate ligaments. The P.A. referred Smith to the medical director (Dr. Obaisi) for follow-up and prescribed Naprosyn 500 mg. *Ibid*.; Doc. 81 at ¶¶ 21-22.

Smith was scheduled to see Dr. Obaisi on March 19 and May 22, 2014, but neither appointment took place. Doc. 76 at ¶¶ 35, 38; Doc. 81 at ¶¶ 23-24. The May 22 appointment appears not to have been rescheduled. At his request, on August 8, 2014, Smith was placed on Dr. Obaisi's schedule for September 10, 2014. Doc. 76 at ¶ 39; Doc. 81 at ¶ 25. That appointment was rescheduled to October 9, 2014, due to a prison lockdown. Doc. 76 at ¶ 40; Doc. 81 at ¶ 26. Plaintiff saw medical providers on September 12 and October 2, 2014, but the records of those visits reflect no complaints of knee pain. Doc. 76 at ¶¶ 41, 42. On November 26, 2014, no medical provider was available, and Smith was rescheduled to January 6, 2015. Doc. 81 at ¶ 27.

On January 6, 2015, Dr. Obaisi finally saw Smith, who reported that his knee had hurt for six months with occasional swelling. Doc. 76 at ¶ 44; Doc. 81 at ¶ 28. Dr. Obaisi found no swelling or heat, explained that Smith's x-ray was within normal limits, diagnosed a "sprained medial collateral ligament," and prescribed Motrin 400 mg twice a day for four weeks. Doc. 76 at ¶ 44. On January 23, 2015, Smith was scheduled to see a nurse but did not attend due to a conflicting personal visit. *Id*. at ¶ 46. On February 10, 2015, Dr. Obaisi again examined Smith, who reported ongoing pain. *Id*. at ¶ 47; Doc. 81 at ¶ 29. Again, Dr. Obaisi observed no heat or swelling and found the knee to be within normal limits. Doc. 76 at ¶ 47. Dr. Obaisi prescribed a knee sleeve, a device intended to reduce knee pain by taking pressure off the joint, and asked prison officials to allow Smith to wear it for a year. *Id*. at ¶¶ 47-48; Doc. 81 at ¶¶ 29, 30. Smith received the knee sleeve on March 25, 2015. Doc. 76 at ¶ 48; Doc. 81 at ¶ 30.

All told, Smith's knee or gait was evaluated in at least seven appointments. Doc. 76 at ¶¶ 29, 31, 33, 34, 37, 44, 47; Doc. 81 at ¶¶ 13, 15, 19, 21. He also was examined by medical personnel, including a doctor in the asthma clinic and nurses at sick call, on at least seven other

6

occasions, and the records of those visits do not reflect complaints of knee pain. Doc. 76 at ¶¶ 30, 32, 36, 39, 40-42, 45. After his February 2015 visit with Dr. Obaisi, Smith never again sought treatment for his knee, although he had more than a dozen medical visits in the asthma clinic and with nurses and doctors (including Dr. Obaisi) for other symptoms between then and October 25, 2016. *Id*. at ¶¶ 49-67; Doc. 81 at ¶¶ 31, 32. Smith reported that this was because the pain had lessened. Doc. 76 at ¶ 49; Doc. 81 at ¶ 32.

At the time of his deposition in September 2016, Smith worked in the "personal property" department at Stateville. Doc. 76 at ¶ 3; Doc. 76-1 at 1. In this role, he packed the belongings of other inmates who were transferred to other divisions within the prison. Doc. 76 at ¶ 3.

Smith spoke with Warden Williams perhaps twice, "if that," about his knee pain. Doc. 81 at ¶¶ 34, 40; Doc. 81-2 at 39 (Tr. 126:17-127:2). Smith does not recall the dates of either conversation—although he believed they were two to three years prior to his September 2016 deposition—but remembers that in one conversation he and other inmates complained to Williams that despite attempts to "put [in] medical slips," they "weren't getting no assistance." Doc. 81 at ¶¶ 38, 41-42, 44. Williams responded that he would "try to get [Smith] over there." *Id*. at ¶ 35. Smith had no other personal contact with Williams, and hinged his belief that Williams was aware of his situation on those two conversations. *Id* at ¶ 43. Smith also submitted grievances, which were reviewed by Williams's designee. *Id*. at ¶¶ 46-47.

## Discussion

Smith alleges that Defendants acted with deliberate indifference to his medical needs by failing to properly treat his knee; specifically, he complains about the rescheduling and delays in his appointments with Dr. Obaisi, suggests that he should have been referred for care by an outside

7

specialist, and claims that Wexford was responsible for the allegedly deficient care due to a policy or practice of marginalizing patient care to cut costs. Doc. 29. A prisoner bringing a § 1983 claim for denial of medical and mental health care "must meet both an objective and a subjective component." *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775-76 (7th Cir. 2014). First, "the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). Second, the prisoner must prove that "the individual defendants were deliberately indifferent to the substantial risk." *Ibid*.

### A. Objectively Serious Medical Condition

On this record, Smith's knee pain does not qualify as an objectively serious medical condition. Not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997); *see also Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) (explaining that "minor aches and pains" do not rise to the level of a serious medical condition). "A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). A condition also may be objectively serious if a "failure to treat [it] could result in further significant injury or the unnecessary and wanton infliction of pain." *Hayes*, 546 F.3d at 522 (quotation marks and citation omitted). Where, as here, an inmate complains of a delay in treatment, he must show that the claimed delay had a detrimental effect on his condition. *See Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); *Reece v. Groose*, 60 F.3d 487, 491-92 (8th Cir. 1995) (noting that evidence

8

regarding delay "goes to the objective component of the alleged medical-needs violation of the Eighth Amendment"). Absent a risk of significant harm, pain in a joint from a sprain or other cause is not necessarily a serious medical condition under the Eighth Amendment. *Compare Bacon v. Harder*, 248 F. App'x 759, 761 (7th Cir. 2007) ("Ample evidence in the record support[ed] the district court's conclusion that [the plaintiff's] ankle sprain did not constitute a serious medical need."), *and Harvey v. Ghosh*, 2015 WL 8329876, at *5 (N.D. Ill. Dec. 9, 2015) (holding that an ankle sprain and the resulting chronic pain about which the inmate sought treatment for two years did not constitute objectively serious medical need where he continued to play basketball), *with Alvarez v. Wexford Health Sources, Inc.*, 2016 WL 7046617, at *4 (N.D. Ill. Dec. 5, 2016) (holding that an ankle sprain resulting in chronic pain for which inmate received pain medication, a cortisone shot, a brace, and a referral to specialist might suggest a serious medical condition).

When Smith first saw a nurse for knee pain, a prompt x-ray revealed no fracture, and no external objective symptoms indicated a serious condition. In repeated visits, medical providers observed no bruising, swelling, or heat in his knee. Smith was diagnosed with a sprained knee that resolved without invasive medical intervention. In fact, Smith now performs a job packing other inmates' possessions for moving and his usual activities. Under these circumstances, Smith's knee injury, while no doubt uncomfortable, was not an objectively serious medical condition. And significantly, although Smith's chief complaint regarding his treatment appears to have been a delay in seeing Dr. Obaisi, the record contains no evidence that any delay in treatment worsened his condition. *See Knight*, 590 F.3d at 466; *Padilla v. Bailey*, 2011 WL 3045991, at *6 (N.D. Ill. July 25, 2011) ("[B]ecause [the plaintiff] did not introduce 'verifying medical evidence that shows that his condition worsened because of the delay,' his [] claim fails.") (quoting *Knight*, 590 F.3d at

9

466)).  In the absence of a serious medical need, worsened by a delay in treatment, Smith has no viable deliberate indifference claim.

### B. Deliberate Indifference

Even if Smith's knee problems qualified as an objectively serious medical condition, no reasonable jury could conclude that Defendants acted with deliberate indifference.  The subjective element requires a sufficiently culpable state of mind, "something akin to criminal recklessness." *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006) (citation omitted).  Neither medical malpractice, nor negligence, nor even gross negligence suffices.  *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).  For medical treatment to be deliberately indifferent, it must have been "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances."  *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998).  Put another way, the treatment must have been "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."  *Norfleet*, 439 F.3d at 396.

#### 1. Doctor Obaisi

Dr. Obaisi was not deliberately indifferent to Smith's knee problem.  The only record evidence suggesting that Dr. Obaisi had any personal knowledge of Smith's injury prior to examining him in January 2015 was his review of Smith's x-ray results in January 2014.  Those results, however, were negative for any fracture and could not have alerted Dr. Obaisi to any ongoing issue with Smith's knee.  *See Adams v. Ingram*, 2015 WL 1256442, *4 (S.D. Ill. Mar. 17, 2015) (holding that "[n]o reasonable jury could find [that the defendant doctor] was deliberately indifferent to [the plaintiff's] serious medical needs," where the doctor reviewed a nurse's report

10

cataloguing symptoms and incorrectly diagnosing merely a sprain, resulting in delay of over one month before the doctor's examination and diagnosis of a ruptured tendon).

Likewise, there is no suggestion in the record that Dr. Obaisi was aware of Smith's rescheduled appointments or any lapses in rescheduling; other staff members were responsible for scheduling. *See Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (noting that where "someone [other than the defendant] was responsible for the alleged delays," the defendant could not be liable for deliberate indifference); *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (same, where the plaintiff presented no evidence that "delay between the initial visit, the diagnosis, and the visit to the specialist" were within the defendant's control); *Dobbey v. Carter*, 2017 WL 2573210, at *6 (N.D. Ill. June 14, 2017) (where "it is undisputed that the nursing staff at Stateville was responsible for scheduling appointments," holding that "[t]here is no evidence indicating that Dr. Carter should have checked Plaintiff's medical file on February 14, 2012 to ensure that the nursing staff had carried out their duties in scheduling a follow-up appointment for Plaintiff or that any failure to have done so would rise to the level of deliberate indifference"). Despite his role as medical director, Dr. Obaisi cannot be held liable solely the failure of others to promptly ensure that Smith was scheduled to see him. *See Holmes*, 2016 WL 893380, at *4 ("To the extent Holmes believes Dr. Overall, as chief dentist, was deliberately indifferent because employees she supervised failed in their jobs of scheduling a segregation dental unit appointment as she ordered, that argument fails" because "[t]he doctrine of *respondeat superior* is not applicable to § 1983 actions.") (citing *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001)).

When Dr. Obaisi first examined him in January 2015, numerous medical personnel had examined his knee's range of motion and his gait, ordered x-rays that were negative for fracture,

11

prescribed cold and hot packs and pain medications, and observed no swelling, heat, or redness. Dr. Obaisi similarly found no swelling or heat, but prescribed pain medication and saw Smith again a month later, prescribing at that point a knee sleeve to reduce pressure. After that, Smith never again sought treatment for his knee. On this record, no reasonable juror could find that Dr. Obaisi's treatment was "so blatantly inappropriate as to evidence intentional mistreatment." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005); *see also Jordan v. Milwaukee Cnty.*, 680 F. App'x 479, 483 (7th Cir. 2017) ("But Jordan must do more than show that he was not given the very best of treatment; he must show that [nurse practitioner]'s course of treatment was 'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.") (quoting *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016)); *Bacon*, 248 F. App'x at 761 (where the plaintiff "was seen by the prison's medical staff twenty-one times, prescribed several types of pain medication, and given mobility aids" along with "work and recreation restrictions" and diagnostic testing reviewed by medical staff, all of whom "concurred in the diagnosis of a sprained ankle," holding that the plaintiff had "presented no evidence that defendants acted with deliberate indifference").

      **2.**      **Warden Williams**

As Stateville's warden, Williams was a quintessential supervisor. So, for Williams to be liable under § 1983, he must have "know[n] about the [unconstitutional] conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Even assuming that Williams was on notice of Smith's complaints about the treatment of his knee, a high-level non-medical official generally is shielded from liability where an inmate is under the care of medical personnel. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)

("As a nonmedical administrator, [the warden] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the plaintiff]."); *Ortiz v. Bezy*, 281 F. App'x 594, 598 (7th Cir. 2008) ("[A] non-medical prison official is not deliberately indifferent for relying upon medical staff to make appropriate decisions regarding treatment."); *Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006) (holding that the warden was not liable because he believed that medical staff were addressing the plaintiff's medical needs), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013).

The timing of Smith's conversations with Williams is unknown, but Smith submitted grievances after his May 2014 appointment with Dr. Obaisi was not rescheduled. Shortly thereafter, Smith was again placed on Dr. Obaisi's schedule. At the time of Smith's second and third grievances, he was on the schedule to see Dr. Obaisi on September 10, 2014 (although that appointment was rescheduled due to a prison lockdown), with no apparent need for Williams's intervention. Smith's medical records demonstrated frequent medical visits for multiple medical conditions, and Williams was entitled to rely upon the treatment recommendations and the urgency assigned to Smith's condition by the doctors and medical professionals treating him. *See Zirko v. Ghosh*, 2015 WL 6447768, at *16 ("[The Warden] was entitled to rely upon the treatment recommendations provided by the doctors and medical professionals treating [the plaintiff].") (N.D. Ill. Oct. 26, 2015). Accordingly, even taking the evidence in a light most favorable to Smith, there is insufficient evidence for a jury to find that Williams was aware of and deliberately indifferent to his knee pain. *See Wilson v. Seiter*, 501 U.S. 294, 297 ("[O]nly the unnecessary *and wanton* infliction of pain implicates the Eighth Amendment.") (internal quotation marks and citation omitted).

### 3. Wexford

Under governing precedent, Wexford may be held liable under § 1983 only if the *Monell* municipal liability standard is met. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 794-96 (7th Cir. 2014). Accordingly, even if Smith had established an objectively serious medical condition and an individual defendant's deliberate indifference, "[t]o hold [Wexford] liable under § 1983 and *Monell*, [Smith] must demonstrate that [Wexford's] 'official policy, widespread custom, or action by an official with policy-making authority was the "moving force" behind his constitutional injury.'" *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016) (quoting *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016)). Smith may prove an unlawful custom or widespread policy by demonstrating that the challenged practice "was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon*, 819 F.3d at 348 (quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006)). He "can meet this burden by offering 'competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event).'" *Daniel*, 833 F.3d at 734 (quoting *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006)). Thus, Smith must "show more than the deficiencies specific to his own experience," but instead bring forth "evidence that could allow a reasonable trier of fact to find … systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system." *Id.* at 734-35 (internal quotation marks and citations omitted). He then must "show that a policymaker or official knew about these deficiencies and failed to correct them." *Id.* at 735.

Although the operative complaint alleges that Wexford maintained a policy of prioritizing "cost over care," Doc. 29 at ¶ 35, the record contains no evidence supporting the existence of such a

policy. Moreover, the record does not support a finding that any missteps in Smith's care were attributable to cost concerns or any other widespread practice beyond "deficiencies specific to his own experience." *Daniel*, 833 F.3d at 734. Accordingly, even putting aside the lack of an objectively serious medical condition and lack of deliberate indifference by the individual defendants, Wexford is entitled to judgment as a matter of law.

## Conclusion

For the foregoing reasons, Defendants' summary judgment motions are granted, and judgment will be entered in their favor. If Smith wishes to appeal, he must file a notice of appeal with this court within thirty days from the entry of judgment and pay the $505.00 filing fee. *See* Fed. R. App. P. 4(a)(1). Under Federal Rule of Appellate Procedure 24(a)(1) and 28 U.S.C. § 1915, Smith may move this court to allow him to proceed *in forma pauperis* on appeal, which will allow him to pay that fee in installments. The fee must be paid regardless of the appeal's outcome; however, if Smith is successful, he may be able to shift the cost to Defendants. *See* Fed. R. App. P. 39(a)(3); *Thomas v. Zatecky*, 712 F.3d 1004, 1005 (7th Cir. 2013) ("A litigant who proceeds *in forma pauperis* still owes the fees. If he wins, the fees are shifted to the adversary as part of the costs; if he loses, the fees are payable like any other debt."). If the appeal does not succeed, Smith could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit or appeal a judgment in federal court without prepaying the filing fee, unless he is in imminent danger of serious physical injury. *See* 28 U.S.C. § 1915(g).

Smith need not bring a motion to reconsider this court's ruling to preserve his appeal rights. However, if he wishes the court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of judgment. *See* Fed. R. Civ. P. 59(e). The time to file a Rule 59(e) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

November 14, 2017

_____
United States District Judge